IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:15-CV-00072-F

| | |
|---|---|
| CARRIE L. JONES, ) | |
| ) | |
| Plaintiff/Claimant, ) | |
| ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-15, -18] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant Carrie L. Jones ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of her applications for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be affirmed.

## I. STATEMENT OF THE CASE

Claimant protectively filed applications for a period of disability, DIB, and Supplemental Security Income ("SSI") on February 9, 2012, alleging disability beginning November 30, 2011.[1]

---

[1] It appears that only Claimant's Title II claim was further adjudicated and considered by the Administrative Law Judge ("ALJ"). (R. 42, 55-56, 81-100).

(R. 42, 162-71). Her Title II claim was denied initially and upon reconsideration. (R. 42, 81-100). A hearing before the ALJ was held on December 18, 2013, at which Claimant, represented by counsel, a witness on Claimant's behalf, and a vocational expert ("VE") appeared and testified. (R. 42, 53-80). On March 5, 2014, the ALJ issued a decision denying Claimant's request for benefits. (R. 39-51). On April 7, 2015, the Appeals Council, after incorporating certain additional evidence into the record and declining to consider other additional evidence, denied Claimant's request for review. (R. 1-7). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded*

2

*by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

3

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since the alleged onset date. (R. 44). Next, the ALJ determined Claimant had the severe impairments of myalgias and muscle hypertrophy. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 44-45).

Prior to proceeding to step four, the ALJ assessed Claimant's residual functional capacity ("RFC") finding Claimant has the ability to perform medium work[2] with the following limitations: frequent, but not constant, reaching overhead with the right arm and no reaching overhead with the left arm. (R. 45-48). In making this assessment, the ALJ found Claimant's statements about her limitations not entirely credible. (R. 46). At step four, the ALJ concluded Claimant was capable of performing her past relevant work as a cleaner/housekeeping, Dictionary of Occupational Titles ("DOT") # 323.687.014, light and unskilled, and SVP-2, but performed as medium; de-boxer/hand packager, DOT# 920.587.018, medium and unskilled, and SVP-2; and production machine tender, DOT# 619.365.010, medium and unskilled, and SVP-2. (R. 48). The ALJ also noted that the VE testified if Claimant were limited to light lifting, she could still perform her past relevant work as a cleaner/housekeeping. *Id.*

Claimant contends the ALJ erred by (1) ignoring probative evidence tending to support

---

[2] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, he can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

4

Claimant's allegations regarding her functional limitations and failing to perform an adequate functional analysis pursuant to S.S.R. 96-8p, and (2) failing to address the statement of a medical source that conflicts with the ALJ's decision. Pl.'s Mem. [DE-16] at 8-14.

## V. DISCUSSION

### A. The ALJ's RFC Determination

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); *see also* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 404.1545(a)(3); *see also* S.S.R. 96-8p, 1996 WL 374184, at *5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ and the ALJ also discusses a claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 WL 374184, at *7. In *Mascio v. Colvin*, the Fourth Circuit explained that S.S.R. 96-8p requires the ALJ to "'first identify the individual's functional limitations or restrictions and assess his or her work-related

5

abilities on a function-by-function basis, including the functions' listed in the regulations." 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The ruling further requires "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting S.S.R. 96-8p). "Only after such a function-by-function analysis may an ALJ express RFC 'in terms of the exertional levels of work.'" *Monroe v. Colvin*, — F.3d —, 2016 WL 3349355, at *2 (4th Cir. June 16, 2016) (quoting *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p)).

Here, the ALJ failed to perform an explicit function-by-function analysis. (R. 45-48). However, the Fourth Circuit has rejected "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." *Mascio*, 780 F.3d at 636. Rather, the court explained that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (citation omitted). Defendant argues that the ALJ appropriately articulated the reasons for the RFC determination and that substantial evidence supports the determination that Claimant can perform a limited range of medium work. Def.'s Mem. [DE-19] at 7-14. Therefore, despite the ALJ's failure to conduct the function-by-function analysis, the court must look to the ALJ's RFC discussion to determine whether it otherwise provides a sufficient basis for meaningful review.

In assessing Claimant's RFC, the ALJ first summarized Claimant's hearing testimony: she has constant pain in her left shoulder that radiates down into her arm and movement causes pain; she has pain in her lower back that shoots down her back legs; she experiences numbness and swelling in her hands; for relief, she showers with hot water, washes dishes with hot water, and takes

Tramadol; and she has had no testing for these problems in the past year. (R. 45). In terms of functional ability, she can sit and stand for 10 minutes; walking causes pain in her lower back; she can lift a gallon of milk, but needs to use both hands; she cannot open a jar; and she cannot raise her left arm. *Id.* The ALJ found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely credible." (R. 45-46).

The ALJ next considered Claimant's medical records. The ALJ generally acknowledged Claimant's history of arthritis and joint pain affecting the shoulders, elbow, hand, lower back, and knees, and noted that Claimant's arthritis has particularly affected her shoulders, causing difficulty with raising her arms and overhead reaching. (R. 46). The ALJ found that, otherwise, Claimant's symptoms have been "mild, with fairly benign physical examinations" and treated conservatively primarily with non-steroid anti-inflammatory medications such as Naproxen. *Id.* The ALJ discussed the following specific treatment notes: Claimant was first seen for muscle and joint stiffness in March 2001, but in a follow-up visit on May 25, 2011, her physical examination was entirely normal, she had a mildly elevated CK level and some muscle hypertrophy, and she was started on Cymbalta (R. 245-46); on January 25, 2011, the claimant underwent an electromyographic study ("EMG"), which was normal (R. 264); on July 22, 2013, in a visit to establish care, Claimant complained of joint pain, particularly of the shoulders and legs, was diagnosed with lumbago and joint pain, and was prescribed Naproxen (R. 311-15); on August 26, 2013, Claimant's treating physician indicated that although non-steroid anti-inflammatory medications had been effective, he was going to stop those secondary to Claimant's renal insufficiency and prescribe Hydrocodone (R. 335); and on November 30, 2013, Claimant was noted to be taking her medications as instructed with no

7

medication side effects noted, and a physical examination showed her extremities, gait, reflexes, and sensation were all normal (R. 356). (R. 46). The ALJ found that Claimant's hypertension, gastroesophageal reflux, hyperglycemia, hyperlipidemia, and renal insufficiency were medically managed with medication, and did not result in any functional limitations. *Id.*

The ALJ considered a consultative examination conducted by Dr. Masere on March 3, 2012. The ALJ noted Claimant's physical examination was largely unremarkable with no joint swelling, erythema, effusion, tenderness, or deformity; muscle strength was 5/5 in all muscle groups; sensory examination was normal to light touch; straight leg test was negative bilaterally; reflexes were symmetric in biceps, brachioradialis, patellar, and Achilles distribution; range of motion was within normal limits in all areas except the shoulders, with shoulder abduction of 100 degrees on the left and 60 degrees on the right, forward elevation of 100 degrees bilaterally, and external rotation of 60 degrees bilaterally; she was able to lift, carry, and handle light objects, squat and rise with some difficulty, rise from a sitting position without assistance but had difficulty getting up and down from the exam table; she walked on heels and toes with difficulty, tandem walking was normal, and she could stand but not hop on either foot bilaterally; she had trouble raising her arms, especially the left arm, and Dr. Masere felt this was related to adhesive capsulitis, tendonitis, or the possibility of rotator cuff tear. (R. 46-47, 293-98). The ALJ noted Dr. Masere's conclusions regarding Claimant's functional abilities, including that she could be expected to sit, stand, and walk normally in an eight-hour workday with normal breaks; would not need an assistive device for short or long distances or uneven terrain; would have moderate limitations with lifting and carrying weight due to bilateral shoulder pain; would have no limitations on bending, stooping, crouching, and squatting, and would be able to perform these frequently; would need no manipulative limitations on reaching, handling,

8

feeling, grasping, or fingering, and would be able to perform these frequently; and would need no visual, communicative, or work place environmental limitations. *Id.*

The ALJ next weighed the opinion evidence. The ALJ gave Dr. Masere's findings "considerable weight" because she submitted a detailed report, which included a physical examination, range of motion studies, and observations, and her examination was thorough and consistent with the evidence of record. (R. 47). The ALJ also considered the reports of the state agency medical consultants who opined Claimant was limited to light work. (R. 47, 82-98). The ALJ was "not persuaded" by the opinions because the physicians did not examine Claimant or have the benefit of the full record and did not adequately express why they gave limited weight to Dr. Masere's findings. (R. 47).

The ALJ concluded by providing the following summary analysis:

> The clinical findings, including physical examinations, have been largely unremarkable (normal strength, sensation, etc.), except for the claimant's shoulder limitations. The claimant's impairments have responded to conservative medical management, therefore reducing the severity and duration of these disorders. The signs, symptoms, and laboratory findings reflect that there has been improvement in the claimant's symptoms, thus reducing the resultant limitations in the claimant's functioning. No treating source has advised the claimant to limit her activities, or to restrict activities of daily living in any manner. The findings of the examining neurologist were normal with no clear presence of muscle weakness and no clear diagnosis. Treating physician notes do not show the ordering of new tests or a referral to an orthopedic specialist.
>
> In sum, the above residual functional capacity assessment is supported by the clinical and diagnostic evidence of record showing no verifiable musculoskeletal condition, which would preclude performing the requirements of medium work as set forth above. The above residual functional capacity assessment is supported by the longitudinal treatment record, the effectiveness of the claimant's treatment and medication regimen, as well as the opinions of the treating physicians and consultative examining physicians (Exhibits 1F-6F).

(R. 47-48).

Claimant first contends that the ALJ ignored evidence, including a muscle biopsy that revealed she was suffering from Type II muscle fiber atrophy (R. 245), reduced motor strength in several muscle groups on examination and difficulty standing from a seated position in January 2011 (R. 252), reduced grip strength noted by Dr. Masere (R. 296), abnormal blood testing indicating markers for chronic disease (R. 247), and a diagnosis of osteoarthritis in 2013 with objective crepitation in her shoulders and knees (R. 312, 376). Pl.'s Mem. [DE-16] at 8-10.

The diagnosis of an impairment does not establish that it is debilitating. *See Fields v. Astrue*, No. 5:10-CV-463-FL, 2011 WL 6019902, at *8 (E.D.N.C. Nov. 3, 2011) (unpublished) ("[T]he diagnosis of a condition is not enough to prove disability; '[t]here must be a showing of related functional loss.'") (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.1986)), *adopted by* 2011 WL 6019951 (E.D.N.C. Dec. 2, 2011). The ALJ acknowledged Claimant's history of arthritis and joint pain affecting the shoulders, elbow, hand, lower back, and knees, but found that the medical records demonstrated "fairly benign physical examinations" and that Claimant's impairments have responded to conservative treatment. (R. 46). Although Claimant argues that the ALJ's determination that she was not entirely credible because her symptoms had been treated conservatively was improper, Pl.'s Mem. [DE-16] at 11, the Fourth Circuit has found this to be an acceptable consideration. *See Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) (4th Cir. June 1, 2015) (unpublished) ("[I]f all that the claimant needs is conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is."); *Richardson v. Colvin*, No. 4:14-CV-00125-FL, 2015 WL 5725546, at *6 (E.D.N.C. Aug. 11, 2015) (unpublished) (finding conservative treatment lends little support to claims of debilitating symptoms), *adopted by* 2015 WL 5737613 (E.D.N.C. Sept. 30, 2015). The ALJ cited an August 26,

2013 treatment note regarding Claimant's osteoarthritis indicating that despite the effectiveness of non-steroid anti-inflammatory medications, Claimant would have to stop taking them due to renal insufficiency and Claimant was prescribed Hydrocodone. (R. 46, 335). Claimant points to no evidence that she received more aggressive treatment and testified that she had no additional testing in the year prior to the administrative hearing (R. 70).

Additionally, the ALJ expressly considered the fact that Claimant had a mildly elevated CK level, some muscle hypertrophy, difficulty getting up and down from the exam table, and complained of joint pain, particularly of the shoulders and legs. (R. 46). While Claimant correctly points out that a January 7, 2011 treatment note reflects reduced strength (4/5) bilaterally of the deltoids, hip flexors, quadraceps, and hamstrings (R. 252), the ALJ noted that on May 25, 2011, at a neurology consultation with Dr. Chahin, Claimant's physical examination was "entirely normal," and the treatment note further states that she had "normal strengths in the upper and lower extremities" and "her presentation [with stiffness of her joints and muscles] could suggest this may be very benign inherited myopathy . . .; however, this is not causing any weakness." (R. 46, 245-46). The record also indicates that at Claimant's initial visit with Dr. Chahin on March 31, 2011, her strength was "5/5 all muscle groups except for abductor pollicis brevis 4/4," but she was "able to make [] complete fists with both hands" and Dr. Chahin noted he "could not detect any weakness in this patient," including in her finger flexors or any of her muscles. (R. 247-49). Where there is conflicting evidence in the record, it is the province of the ALJ to resolve inconsistencies leaving the court to determine if the ALJ's determination is supported by substantial evidence. *Hayes*, 907 F.2d 1453, 1456 (4th Cir.1990) (citations omitted). Accordingly, where the ALJ did not impermissibly ignore evidence and there is substantial evidence in the record supporting the ALJ's resolution of

11

inconsistent evidence, this argument lacks merit.

Next, Claimant contends Dr. Masere's opinion, to which the ALJ afforded considerable weight, is inconsistent with the ALJ's RFC because Dr. Masere found Claimant had moderate limitations in lifting due to limited range of motion and pain. Pl.'s Mem. [DE-16] at 10. The ALJ noted Dr. Masere's conclusion that Claimant "would have moderate limitations with lifting and carrying weight due to bilateral shoulder pain." (R. 47). While the ALJ gave Dr. Masere's opinion "considerable weight" and imposed restrictions of "frequent, but not constant, reaching overhead with the right arm" and no reaching with the left arm, the ALJ's finding that Claimant could perform medium work involving "lifting and/or carrying objects weighing up to 25 pounds on a frequent basis and up to 50 pounds on an occasional basis" is at odds with Dr. Masere's opinion that Claimant would have moderate limitations with lifting and carrying weight. (R. 45). The ALJ does not explain this material contradiction, and the failure to do so was error. Notwithstanding, the error here was harmless based on the ALJ's finding that Claimant could also perform her past relevant light exertion work.

Dr. Masere stated Claimant's reported functional limitation was lifting and carrying 5–10 pounds frequently and 10–20 pounds occasionally (R. 294), which is consistent with light work, 20 C.F.R. § 404.1567(b). At step four the ALJ cited the VE's testimony that if Claimant were limited to light lifting, she could still perform her past relevant work as a cleaner/housekeeping (R. 48, 73).[3] *See Holloway v. Colvin*, No. 8:12-CV-02664-DCN, 2014 WL 1315249, at *28 (D. S.C. Mar. 30, 2014) (unpublished) ("Even assuming Plaintiff's impairments limit him to light work, and assuming

---

[3] The ALJ noted at the hearing that if Claimant could not do her past relevant work, she would be entitled to an award of benefits under the Grids at the light or sedentary level. (R. 73).

12

the ALJ's determination that Plaintiff is capable of performing medium work was an error, the Court finds this error harmless and the Court need not reverse agency action because of a harmless error.") (citing *Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required when the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.") (citations and internal quotation marks omitted) (additional citation omitted)); *Barnes v. Colvin*, No. 5:12-CV-696-D, 2013 WL 6985182, at *13 (E.D.N.C. Nov. 13, 2013) (unpublished) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.") (citation omitted)), *adopted by* 2014 WL 126059 (E.D.N.C. Jan. 13, 2014). Accordingly, Claimant's argument lacks merit.

Claimant also asserts the ALJ failed to point to evidence demonstrating Claimant has the ability to use her arms and hands for exertionally demanding work as required by the function-by-function analysis. Pl.'s Mem. [DE-16] at 12-13. The ALJ imposed restrictions of frequent, but not constant, reaching overhead with the right arm and no reaching overhead with the left arm. (R. 45). And the ALJ indicated Claimant could perform her past relevant work as a cleaner/housekeeping with this limitation. (R. 73). While acknowledging Claimant's testimony that she cannot open a jar (R. 45), the ALJ cited evidence in the record that supports the absence of a manipulative limitation in the RFC. For example, the ALJ cited Dr. Chahin's treatment notes, which indicated that while Claimant had reported hand weakness and difficulty opening bottles and jars, on his initial examination Dr. Chahin detected no muscle weakness and Claimant was able to make a complete fist with both hands. (R. 46, 247-49). On a follow-up visit two months later Dr. Chahin noted mild

13

weakness in Claimant's thenar muscles that could be indicative of carpal tunnel, but that a nerve conduction study and EMG on the right side was entirely normal. (R. 46, 245-46). Dr. Chahin prescribed Cymbalta and stated he would see Claimant in six months if needed. (R. 246). There are no further treatment records from Dr. Chahin in the record. Further, although Dr. Masere rated Claimant's grip strength as 4/5, she determined Claimant needed no manipulative limitations. (R. 296, 298). Accordingly, the ALJ's failure to conduct a function-by-function analysis does not frustrate the court's review of the decision here, and the ALJ adequately addressed Claimant's ability to use her arms and hands.

Finally, Claimant contends the ALJ ignored the statement of a medical source that conflicts with her decision. Pl.'s Mem. [DE-16] at 13. A May 25, 2011 treatment note from Dr. Chahin states as follows: "The patient states she cannot work because of pain and maybe she should apply for temporary disability." (R. 246). Claimant characterizes the later part of this statement as a medical opinion that the ALJ was required to consider. While Claimant is correct that the ALJ must evaluate medical opinion evidence, 20 C.F.R. § 404.1527(c), the statement at issue does not constitute a medical opinion within the meaning of the regulations.

Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Therefore, "[o]nly those statements . . . that reflect judgments regarding a claimant's prognosis or limitations, or the severity of symptoms," and not those which merely report subjective complaints of the claimant's pain, constitute medical opinions as defined in the

14

regulations. *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (unpublished) (citations omitted), *adopted by* 2013 WL 5350870 (E.D.N.C. Sept. 24, 2013). The statement from Dr. Chahin's treatment note says nothing about Claimant's symptoms, diagnosis, prognosis, or functional limitations. (R. 246). Additionally, the ALJ specifically considered this treatment note, stating that Claimant's physical examination was "entirely normal," she had an elevated CK level and some muscle hypertrophy, was started on Cymbalta, and was still working during this time. (R. 46). Finally, even accepting Claimant's reading of the note that the statement is attributable to Dr. Chahin, as opposed to Defendant's alternative interpretation that it is Claimant's subjective statement, it suggests applying for "temporary disability," and the failure to weigh it is not error where it relates to a restriction or condition that is "temporary in nature." *Carroll v. Colvin*, No. 7:14-CV-173-RJ, 2015 WL 5737625, at *12 (E.D.N.C. Sept. 30, 2015) (unpublished) (citing *Lamb v. Astrue*, No. 3:07-CV-789, 2008 WL 4890580, at *4 (E.D. Va. Nov. 12, 2008) (unpublished) (determining that the ALJ did not err in failing to weigh a temporary work limitation which was to last six months from the date of onset where that opinion was consistent with other record evidence as to the claimant's current condition and where that limitation was only temporary in nature)). Accordingly, Claimant's argument is without merit.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-15] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-18] be ALLOWED, and the final decision of the Commissioner be affirmed.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **August 1, 2016** to file

written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

SUBMITTED, this the __18__ day of July 2016.

Robert B. Jones, Jr.
United States Magistrate Judge

16